My name is Charles Talbot representing Mr. DeClements. This case is an appeal on a social security disability case. And the issue in this case is not whether Mr. DeClements is disabled, but rather when did he become disabled. This case can be viewed in two contexts because what we're really dealing with here is a very short period of time. Mr. DeClements was found disabled by the administrative law judge on May 27, 2002. He alleged he became disabled four months earlier on January 16, 2002. It may seem like a short period of time, but it's important for Mr. DeClements because his date last insured for social security disability insurance purposes is March 31, 2002, about right in the middle of this span of time. I wondered why we were going through all of this for four months. Well, it's very important to him because the amount of his benefit payment changes substantially, and the rules for receiving benefits change substantially whether he's on disability insurance SSDI, Title II, or whether he's on supplemental security income SSI, Title XVI. The medical rules for both programs are identical, but the non-medical rules are certainly different depending upon which program you qualify for. I got it. Thank you. Now, this case can be looked at from a narrow context or from a broader context. As to the narrow context, what's important in this case are three medical reports. There's an emergency room report from January of 2002, and then there's a medical and psychological evaluation done in April 2002 at the request of the Department of Social Health Services. Now, each of those reports, one physical, one mental, standing alone would seem to qualify Mr. DeClements for disability benefits. Combined, they even provide greater proof of his level of disability. The ALJ chose not to accept those reports and rejected them. This leads to the broader issue in the case. Will you explain why the January report entitled him to benefits? Because it indicates that he is significantly impaired even beyond the October report. He was taken in and seen on an emergent basis. Now, what that does is your question points to where is the onset date. We picked January 16, 2002, because of the fact that this was the first significant hospitalization after his departure from incarceration. This brings up the 8320, the SSR 8320 issue, and that is when there's a person who has been determined to be disabled, but there's an issue about when their condition is serious enough to cause a disability. It leads to a suggestion and, in fact, a requirement that medical requirements or medical sources be summoned, a doctor, whether in this case a psychologist or a physician, to come in and say, okay, there's a lot of evidence in this case. Now, I'll point out that the two consultative examinations for DSHS were shortly after the date last insured. I think they were in April 2002. But they indicate a level of seriousness that one can reasonably presume existed before the date last insured. We have physical problems by Dr. Pouzon, who says that this guy is severely impacted and is not able to work, and likewise on the mental context. And could you give me again that date last insured? It's sometime in March. March 31, 2002, the end of the first quarter. March 31, okay. What's the earliest that the medical information reflects a disability? The earliest medical information is the report of Dr. Pouzon on April 17, 2002, just two and a half weeks after the date last insured. That's 234 and 235 in the record. And what does he say about disability? He says that Mr. DeClements is severely limited, which in the context of that report puts him at less than sedentary level of physical ability. Severely limited in what? In his physical abilities. The report allows the doctor to write a level of physical ability, sedentary, light, and so on. In this particular report, he rates Mr. DeClements at less than sedentary, severely limited, and says he can't work until he gets his surgery to fix the medical condition that disables him, in this case the hernia condition. Does that indicate a temporary disability? It may, except that there were a number of surgeries in May and June to try to fix this problem, and he still had lingering symptoms. It's essentially a prediction. You know, when Dr. Pouzon made his estimate of disability, he is estimating that if Mr. DeClements gets the surgery, that perhaps he will be able to return to work at that point. That's trying to foretell the future. That's a best estimate. In fact, this case, it turned out not to be the case, but based on Dr. Pouzon's report, as well as Dr. Wingate, which was 13 days later, both of them opined for separate reasons that Mr. DeClements was disabled. And you say it's not turned out to be the case. Could you enlighten us as to what that means? Well, Mr. DeClements, after the gunshot injury of May 27, 2002, suffers from a variety of both physical and mental problems. I see. So it turns out, even though perhaps if he had not had the gunshot wound, he might have recovered through the surgery. It's turned out that. . . Yeah, and in fact, a judge found following May 27 that he was at the sedentary level of physical ability, but he also had mental issues which precluded regular attendance in the workplace. I see. So even if the disability diagnosed by Dr. Pouzon on the 17th of April was temporary, if we're looking only at the hernia, in your words, it hasn't turned out that way because additional disability causation has intervened. Okay, I got it. But the gunshot wound was after the date last insured, though. Correct. It was on May 27. But you're arguing if we were to find that there's enough evidence here in the record that he was disabled before the 31st of March, that is to say about two and a half weeks before this report in which Dr. Pouzon said he was severely limited, unable to lift at least two pounds or unable to stand and or walk, that for your purposes takes care of it. So the question is whether there's a reasonable basis to infer based upon the January report and then the April medical examination. My problem with the case, not with your side of the case but with the other side of the case, is there's essentially no countervailing evidence. I mean, if I just look at this, it says he's disabled, and it's not very hard to say, well, if he's this disabled on the 17th of April and we know that he had this hernia in January, it's not much of a leap to say that he was this disabled two and a half weeks before that April examination. Well, let me suggest this. Both your Armstrong case, which we cited in the materials, and SSR 8320 talk about the need for medical evidence or medical testimony to hearing when you have perhaps an issue about onset. We clearly know that the condition existed. But that's only if the person is found disabled, and the ALJ did not find this person disabled. He did in May, and the hernia was part of the mix. We also have hernia said to be totally disabled in April. We have a hernia condition that's a seriously significant. Earlier than that, that requires hospitalization in January and October. The difficulty I have with your argument is on page 234 on the assessment, it says he's severely limited, but it says that how long do you estimate the person will be unable to perform? It says after repair of hernia. So it's a temporary fix, and it just says that he needs surgical consultation and repair. So it doesn't indicate that this is a disability, just that he needs the surgery to repair the hernia. I understand, but like I said in response to the other judge's question, that that was a prognostication in April, given an estimate as to what would be likely to occur if the surgery was undertaken. In fact, there were three surgeries undertaken following the gunshot wound of May 27th. They weren't entirely successful in relieving the symptoms and relieving the effects of both the hernia condition and the gunshot wound. Remember, the gunshot wound is right in essentially the same area where the hernia was. It was in the lower abdominal area. And so they had to do three different surgeries to try to fix that problem, following which we didn't get as good an outcome as one might hope, never to the point of allowing him to return to work. And certainly the RFC finding after that date reflects a decline in – a significant decline in physical ability, now coupled with the mental health aspect. Okay. Listen, you've exceeded your time. Let's hear from the government and we'll make sure you get a chance to respond. Thank you. Yeah. I'm a little bit shorter than Mr. Talbot. May it please the Court. Lisa Wolfe on behalf of the Commissioner. This is a case in which the ALJ issued a partially favorable decision in July 2006, finding Mr. de Clement disabled as of May 27th, 2002. That date coincided with a gunshot injury that Mr. de Clement sustained and he had to undergo two surgeries to remove the bullet. And by way of surgery, he also had his hernia repaired. Let me cut to the chase as far as I'm concerned. If we were to conclude that there was enough medical evidence that the ALJ should have concluded, that is to say he was compelled to conclude that he was disabled from the hernia as of the date of March 31st, does it matter for purposes of this case that disabling from the hernia was potentially temporary? Well, we need – that's a complicated question. It seemingly is a simple question, but we need to look at the record in this case. We also need to look at Megalaney's, which suggests that the ALJ – You know, it may be a complicated question, but I'm not hearing you embarking on an answer. Okay. Why don't you start with the definition of disability? I'm sorry. What is the question? Okay. My question is, assume – and I don't ask you to concede – assume that I were to look at this evidence and say, you know, given the January medical report which says, look, he only feels better when he lies down, the April 17th report from the doctor that says he is severely disabled, worse than sedentary work, severely disabled, if I were to conclude that that means that at the latest, as of March 31st, he is simply unable to work. But understanding that that's potentially curable by an operation, is he disabled as of that date on March 31st within the meaning of the Social Security Administration statute? Right. He possibly could be, yes. What do you mean possibly? Why do you say possibly? Because he didn't have the hernia operation that he was recommended to have as early as October 2001. And that's at the excerpt of Record 221. He's not been compliant with treatment. Even Dr. Pouzan said – checked off at the excerpt of Record 235, not compliant with treatment. He needed to have a hernia surgery repair. It was causing him extreme symptoms. But you're saying he should have had the operation while he was incarcerated? He should have had – he should have followed through with recommendation. He had been out of custody in early 2002. We're looking at – No, wait a minute. When are you saying he should have had his surgery? He should have followed and obtained surgical authorization to have the surgery. When? When able to. And what happens if he has no insurance? What happens if he's incarcerated? What do you mean he should have had the insurance? I'm trying to figure out when the obligation is upon him to do something, and we're going to hold him against it if he didn't do it. Right. So we look at – we have to look at what the ALJ had before him. And what he had before him were recommendations for the hernia repair. Even Mr. de Clement's surgeon, his actual treating physician, said he could return to light work in July 2002 after the gunshot wound. And that's at 265 in the excerpt of Record. But we have a – wait a minute. But we have a finding of permanent disability as of May 2002, don't we? Right. So what the surgeon says in July is irrelevant, right? Here, in essence, the ALJ at page 22 – Okay. I want to come back to the question – the other question I asked you, which also I didn't get an answer to. You're saying that one of the reasons we should find that he's not disabled prior to March 31, 2002 is that he should have had the surgery, correct? There's medical evidence to support a finding that he was not compliant with medical treatment recommendations. And what do we do with the fact that until January he was incarcerated and a prisoner, as you well know, is not fully in control of the medical treatment he may or may not receive? And what do we do with the fact that once he's out of prison, he doesn't have any medical insurance? And my experience, as I read these cases and various things, you can't just walk into a hospital and say, I don't have insurance, but I have a hernia. Would you fix it? So what do we do with that? I'm not sure, Your Honor. I can only look at what the ALJ had the evidence to support. So noncompliant – usually noncompliant means I have the capacity to take the meds, I have a capacity to do it, but through my own volition I don't do it. Now, do you mean that kind of noncompliant, or do you mean we're going to hold it against him that he didn't have the surgery, even without us showing that if he tried to get it, he could have gotten it? Do we have a record at all on any of that, though? Do we have a record whether or not there was Medicaid or Medicare or any – do we have a record that there was a charity hospital or a county hospital? I mean, it's really difficult for me to follow you on that if there's nothing in the record. There's not much of a record as to the eligibility. We do know that Dr. Pouzon was – that was a one-time examination. That's at 234 and 235 in the record. How did he – if he didn't have insurance, how did he get to Dr. Pouzon? That was for DSHS, so there is some indication in the record. And also Dr. Terry Lee Wingate, that was a DSHS evaluation, and that's the Department of Social Health and Services, and that was for eligibility. There's an indication about GAU at 235 in the record. So there's an indication that he – There's too much jargon for me. GAU 235, what's that? The excerpt of the record in 235, those are both DSHS evaluations for purposes of eligibility. There's a note on – Purposes of eligibility for? For state benefits. So he was on some sort of state, and there was a notation on the side – that he wasn't yet eligible, but he might have been. They kind of finished the paperwork. We don't have any paperwork. The record's not clear on that. There was an indication that DSHS surgical authorization should be obtained. So we don't have – like, the record's not entirely complete on that. It's a very good question, and we don't have a complete record also to that question as well. Let me ask you this. If the record were clear – and again, I'm not asking you to concede that the record is clear. If the record were clear that he couldn't get the hernia operation while incarcerated and that he had no insurance up to March 31st, that is to say the last insured date, would you say that he's noncompliant with the consequence that he doesn't get – he's not disabled because he could have got the operation? Is that your position? No. Case law suggests that if that record is made on that point, that can option not be held against the plaintiff. Okay. I'm not clear on part of your argument. You can help me. Sometime in 2001, he was found to have a hernia problem, and it was prescribed for him that he had to have an operation. Now, as of that time, was he disabled without the operation? He was reporting severe – Could he work, in other words, in the national economy? There were no work limitations assessed at that point in October 2001, so we need to look at the work limitations and that would be the appropriate inquiry at that juncture. So I wouldn't be able to answer that question. It sounded like you were saying because he didn't get the operation, we should somehow say that he was not disabled. I'm not following that. We also need to look at the statements he made to Dr. Pouzon that the ALJ did not – adopt Dr. Pouzon's recommendations, and he found that those were partially based on subjective allegations, which he found not entirely credible. Dr. Pouzon made objective findings that there was no indication of limitation on agility, mobility, or flexibility. Despite this assessment, he found less than sedentary work capacity. Yeah, I mean, I have trouble with that because there's no countervailing evidence. All we have is the support from Dr. Pouzon, and what other evidence we have seems consistent that he's had this hernia problem for a long time. I just don't get where the ALJ gets off saying, I don't believe Dr. Pouzon. What countervailing evidence is there? That's part of the problem here. Yeah, that's my problem. It is a sparse medical record, and the ALJ evaluated the evidence, and we task ALJs with this hard job of evaluating, of weighing, of looking at the objective evidence. But is there anything to weigh on the other side from what Dr. Pouzon says? At that juncture, there is only the subsequent 2004. No, there's nothing contemporaneous to that, yeah. Also, on page 235, doesn't Dr. Pouzon say that generally he appears healthy? Yes, that was also another part of Dr. Pouzon's objective findings. And that's what the ALJ noted, that his finding for less than sedentary didn't match up entirely with clinical notes. It's a little inconsistent. But appearing healthy, does that have anything to do with being disabled? Well, the previous emergency room note, he was in extreme pain, had been vomiting from the hernia, and the surgical recommendation was recommended at that time as well. So, you know, the ALJ is not a physician. He looks at the chart notes, he looks at the notations, and it was in his estimation that an RFC for less than sedentary didn't match up with the chart notes that Dr. Pouzon documented in the medical history. And it didn't support that finding. Now, the ALJ could have obtained a medical advisor under the regulations to clarify some of these questions, couldn't he? Yes, he could have. And he did not? He did not. As to the onset date, we need to look at Megalanes, Megalanes, as to the onset date, as it would have, should have, could have, what date the ALJ should have picked, and we need to rely on the date where the onset date is supported by substantial evidence. And here, I find it interesting, this ALJ decision at page 22, the bottom of the very first full paragraph, the ALJ appeared to give the plaintiff here a little bit of benefit of the doubt because his condition deteriorated after the gunshot wound, and it really came to a head during his psychological impairments worsened. And the ALJ extrapolated to the time of the gunshot wound. The evidence could support a disability in 2003. I mean, the evidence was documented at that point. So there's some issue as to the incapacity for sustained employment, and the ALJ here gave him the benefit of the doubt and went back to the gunshot wound, which was May 27, 2002. Okay. Okay? Thanks very much. Thank you. Mr. Talbot, you're over time, but let's give you a minute and see what you have to say. The problem, and I'm addressing your question, is that the ALJ seizes on bits and pieces of Dr. Pouzan's report to try to justify that Dr. Pouzan's report is not supportable. But, in fact, you know, the client... But Dr. Pouzan himself, this is the same guy, says he's severely disabled. Right. Dr. Pouzan... He doesn't say disabled. He says severely limited. Oh, I'm sorry. That's correct. Which is a level of function below a level that a person can sustain work activity. But the definition of disability includes a temporal component, does it not? Yes, it does. And I think, though, that if you have other events after, within the 12-month continuous period... Right. So the disability either has to be permanent or, I'm paraphrasing,  Yes. So what is there in this record that supports a finding contrary to the ALJ, that as of this date of Dr. Pouzan's evaluation, that it was contemplated to be permanent or last for 12 months? There's nothing specifically in the report itself. It just simply says there's an estimate that there will be a return to function if a surgery is performed. No, it says after repair of hernia, not if. So it's contemplated that this is a disability that will last only until it's repaired. And so there's no contemplation that it's permanent or contemplated to last for 12 months, which is the definition of disability. I understand. But I don't think that if you've got other disabilities which come upon the scene within a 12-month period of time, I think you can continue to build on that. That's what the ALJ did for the gunshot wound. At that point he said, well, we have a disability that's either permanent or likely to continue for a period of 12 months. But to me, you're trying to take it back beyond that period of time simply because the onset date, you need to meet an onset date. And I'm not, I mean, in terms of our standard of review, which is whether or not substantial evidence supports the ALJ decision, if there's a question about whether or not the ALJ has evidence, then we have to go with what the ALJ did unless there's contrary evidence. And I don't see this as enough, where on one hand he says he's limited. On the other hand, he says there's an estimated date he can return to work and also says he's otherwise healthy, that that would compel us to reverse the ALJ. But the ALJ didn't base his finding on the fact that there was no 12-month observational meeting. What he did is he said that Dr. Pouzan's report, to him, wasn't sufficient. And he pointed out that- It wasn't sufficient to establish disability. And encompassed in that is the definition of disability. Well, but he didn't say that. What he said is the facts alone, as expressed by Dr. Pouzan, doesn't support Dr. Pouzan's finding of a total disability. There's a distinction here. And what the ALJ seized on is some comments in Dr. Pouzan's report that he appeared healthy, that he didn't have any limitations on certain movements. And obviously Dr. Pouzan was aware of this when he's got the guy in front of him examining him, and he did still find that the individual was disabled at that point from this condition. No, he said he was severely limited. There was a difference. He never said he was disabled. Yeah, but he was sufficiently severely limited as being unable to work at that point. One of the things we were trying to get this court to look at here is what are the limits, or should there be limits, on how an ALJ interprets medical evidence in this particular case when there's really no contrary medical evidence in existence to refute an opinion of a doctor? Okay. Obviously, in the context of the report of Dr. Pouzan, he was aware of these other issues and still found the individual to be severely limited. Okay. Yeah, that's quite clearly laid out in the briefing. I think we're finished. Thank you. Thank both sides for your argument in this last case. The case of the Clements v. Astro is now submitted for decision, and that completes our week. We are in adjournment. Thank you.
judges: Alarcon, Fletcher W. , Rawlinson